SAWYER v. RAILROAD.

(Filed September 11, 1906).

*Slander—Corporations—Torts—Test of Liability—Question for Jury.*

1. Private corporations are liable for their torts committed under such circumstances as would attach liability to natural persons. That the conduct complained of necessarily involved malice, or was beyond the scope of corporate authority, constitutes no defense to their liability.

2. Where the question of fixing responsibility on corporations by reason of the tortious acts of their servants depends exclusively on the relationship of master and servant, the test of responsibility is whether the injury was committed by authority of the master, expressly conferred or fairly implied from the nature of the employment or the duties incident to it.

3. Where the act is not clearly within the scope of the servant's employment or incident to his duties, but there is evidence tending to establish that fact, the question may be properly referred to a jury to determine whether the tortious act was authorized.

4. In an action for slander, where it appeared that the plaintiff went to the office of the superintendent of the defendant company to get employment, and the superintendent, after telling the plaintiff that the company did not want to employ him, proceeded to insult and defame him, the company was not responsible.

142—1

ACTION by A. Sawyer against Norfolk and Southern Railroad, heard by *Judge Walter H. Neal* and a jury, at the March Term, 1906, of the Superior Court of CAMDEN.

The pleadings show the contentions of the parties.

Plaintiff testified in his own behalf, as follows:

"I reside in this county, near Sawyer's Creek. Lived in this county all my life and am forty-two years of age. Have been engaged in various pursuits, mostly merchandising, farming, selling guano, and attending to shipping truck at Belcross. Before April, 1904, I had been working for defendant, helping to load truck for two or three years or more. Defendant company had sidetrack at Belcross, and I looked after truck, seeing that they were properly loaded and that each package was placed in the proper car and properly billed. I was employed by W. W. King, superintendent of Norfolk and Southern, defendant railroad, and received compensation for my services. My work commenced in May and ended with the trucking season, about August, so I was engaged throughout the trucking season.

"Up to 1904 there had been no complaint about my work. In this month I went to Norfolk and went in to see W. W. King in his office. His office was in the general office of the defendant company. The general office is a large building, 60x100 feet, on the second floor. There was a large room cut up into different sections by railings from three to four feet high, and W. W. King's section was to the left as you enter. While in his room I could see many people at work in the several sections; some twenty or thirty were in sight of me, and five or six near enough to hear what was said—these within eight or ten feet of me. I went in Mr. King's office to see him on business, viz., to see if the company wanted to employ me to attend to the loading and shipping of the truck at Belcross station during the trucking season, as they had done in the previous years. I asked him, when he came in,

if he wanted to employ me to attend to the loading and shipping of truck at Belcross as he had done heretofore. He said: 'No. I don't want any such man as you are.' That I had robbed the company and was doing so every chance I got. 'And as to the shortage on potatoes you claim, they were never grown, marked, loaded, or put in the cars. If they had been, they would have been in there when the car got to New York. I do not intend to pay for them. And as to the stock that has been killed by the company, I have paid for them all.' I then told him that I had not received the pay, if he had paid it; that it must be in the hands of some employee or in his possession. I had never received it. He spoke the whole conversation in such an abrupt and insulting manner that of course I was mad. I then went out of the office into the office of the auditor, Mr. Glazier, which was the adjoining section. I had not at that time been paid for the stock.

"I had not worked for them nor had any connection with them since August, 1903, the close of the trucking season.

"Mr. W. W. King was the superintendent in charge of that work—shipping truck. I had never robbed the company in any way. I looked after the whole of the shipping at Belcross on the sidetrack at my farm. I saw the truck was properly loaded, marked, and counted, and reported to the agent for billing purposes. Each piece was properly counted, loaded, and reported to the agent of the defendant company.

"There had been some shortage in a shipment of potatoes made by my uncle, A. Sawyer. These potatoes were shipped and loaded on the defendant's cars. Mr. Godfrey, my man, saw them loaded. Mr. W. W. King spoke very loudly, like folks will when they are mad. It attracted the attention of several in the room, and they looked towards me when he charged me with robbing the company.

"I had no friend with me and was all alone. I was humiliated, and it affected me very seriously. The people in the office gazed at me, and there were several ladies in there.

"The defendant is worth, I suppose, two million dollars. Its road starts at Norfolk and runs through various counties to Washington, N. C. It has steam-boats and ferry connections. I had written to Superintendent King that I was coming to see him at that time, and I went at the time stated, and he said that he expected me. I cannot measure my damage in dollars and cents. My pride was hurt pretty badly. It is terrible for a man to be charged with robbery."

Upon cross-examination witness says:

"I commenced to merchandise in 1888 in copartnership with Mr. Berry. My first year's business was five thousand dollars and it is about the same now. The mercantile business has fallen off. Mr. W. W. King is now dead. He died the same year this talk took place. He looked very healthy, but some time after that had a serious attack of heart failure.

"He spoke the words in a very abrupt and insulting manner."

The defendant moved for judgment of nonsuit. The motion was allowed, and the plaintiff appealed.

*Aydlett & Ehringhaus* for the plaintiff.

*Pruden & Pruden* and *Shepherd & Shepherd* for the defendant.

HOKE, J. There is some authority for the position that corporations cannot in any case be held civilly liable for slander. And it has also been held, and is so stated in several of the text-books, that they are only so responsible when it affirmatively appears that they *expressly* authorized the very words which form the basis of the charge. The first position does not rest on any very satisfactory reason and has been generally rejected; and the second, we think, can only be received with much qualification.

It is now well established that private corporations under certain circumstances will be held liable for torts both negli-

gent and malicious on the part of their servants, agents and employees. The doctrine is stated in Jaggard on Torts, p. 167, sec. 58, as follows: "Private corporations are liable for their torts committed under such circumstances as would attach liability to natural persons. That the conduct complained of necessarily involved malice or was beyond the scope of corporate authority, constitutes no defense to their liability;" and this statement is in accord with well-considered decisions in this and other jurisdictions. *Hussey v. Railroad,* 98 N. C., 34; *Jackson v. Tel. Co.,* 139 N. C., 347; *Railroad v. Quigley,* 62 U. S., 202; *Bank v. Graham,* 100 U. S., 699; *Palmeri v. Railroad,* 133 N. Y., 261.

According to the varying facts of different cases, the question of fixing responsibility on corporations by reason of the tortious acts of their servants and agents is sometimes made to depend exclusively on their relationship as agents or employees of the company, and sometimes the facts present an additional element and involve some independent duty which the corporation may owe directly to third persons, the injured or complaining party. This distinction will be found suggested and approved in 1 Jaggard on Torts, p. 257, sec. 85:

*"Course of Employment:* Another conception of the master's liability rests on the proposition that in certain cases the liability arises, not from relationship of the master and servant exclusively, but also from the duty owed to plaintiff by defendant in the particular case in issue. In dealing with cases in which the question of the liability of the master for the tort of his servant is raised, reference should be had not alone to the relationship of the master and servant, but also to the relationship between the master and the third person complaining of injury. It would seem that the scope of authority test considers too exclusively the form of relationship, and overlooks the latter. In fact, one's right infringed by the wrong of another may be *in personam* or in the nature

of the right *in personam*, as where a passenger complains of the torts of a carrier's servants, or a customer of the torts of a proprietor's servant."

And Hale on Torts, at p. 147, gives the same distinction. It will be noted that the instances given by both of these authors, under the second class, are where the conduct complained of on the part of the employee in the course of his employment was in breach of some duty which the employer owed directly to the passenger in the one case and the customer in the other. They had been invited upon the premises and were there by invitation and under circumstances which gave them the right to considerate and courteous treatment; and, in the case of the carrier, this obligation was further enforced and could be made to rest on the duty arising to the public by reason of its *quasi*-public character, growing out of its chartered privileges, as in *Daniel's case,* 117 N. C., 592.

In the case at bar, however, there is no responsibility attaching by reason of the breach of any special duty owed to the plaintiff by reason of his placing or by reason of the special circumstances of the case. The plaintiff was not a passenger, nor was he in the office by any invitation of the company, general or special. On the contrary, he had gone to the office to see King, the superintendent, of his own motion and for his own advantage—the men were at arm's length considering a business proposition affecting the plaintiff's interest.

The case, then, is one where responsibility must attach, if at all, simply and exclusively by reason of the relationship which King bore to the company and the power given him to select and employ the plaintiff as one of the company's agents. In cases of this character the responsibility of a corporation for slander or other malicious torts, by its agents and employees in the course of their employment, depends in its last analysis on whether the acts complained of were authorized

or ratified by the company. The test of responsibility established by the better considered authorities being, "whether the injury was committed by the authority of the master, expressly conferred or fairly implied from the nature of the employment or the duties incident to it." When such authority is express, the matter is usually free from difficulty; but the authority may be implied, and on a given state of facts admitted or established, frequently is conclusively implied, and responsibility imputed as a matter of law.

In other cases, where the act is not clearly within the scope of the servant's employment or incident to his duties, but there is evidence tending to establish that fact, the question may be properly referred to a jury to determine whether the tortious act was authorized.

And, again, the absence of authority may be so clear that it becomes the duty of the Judge to determine the matter, as he did in this instance.

In Wood on Master and Servant may be found a very extensive and satisfactory discussion of this question. In sec. 279, p. 535, the author says:

"The question usually presented is whether, as a matter of fact or of law, the injury was received under such circumstances that, under the employment, the master can be said to have *authorized* the act; for if he did not, either in fact or in law, he cannot be made chargeable for its consequences, because, not having been done under authority from him, express or implied, it can in no sense be said to be his act, and the maxim previously referred to does not apply. The test of liability in all cases depends upon the question whether the injury was committed by the authority of the master, expressly conferred or fairly implied from the nature of the employment and the duties incident to it."

And, again, the same author, in sec. 307, says:

"The simple test is whether they were acts within the scope of his employment; not whether they were done while

prosecuting the master's business, but whether they were done by the servant in furtherance thereof, and were such as may fairly be said to have been authorized by him.  By 'authorized' is not meant authority expressly conferred, but whether the act was such as was incident to the performance of the duties entrusted to him by the master, even though in opposition to his express and positive orders."

Applying these principles to the facts before us, we are of opinion that the ruling of the Judge below was clearly correct.  As stated, the plaintiff was voluntarily in the office of King (the superintendent) to look after business in his own interest, and the company owed him no independent duty. Granting that King had power to select and employ the plaintiff as agent of the company, when he told the plaintiff that the company did not wish to employ him he had filled the measure of his duty; and when King went further, whether from bad temper or malice or from righteous indignation, and proceeded to insult and defame the plaintiff, he was entirely beyond any authority given him either expressly or which could be fairly implied from the nature of his employment or the duties incident to it; and for such conduct, therefore, King, as an individual, and not the company, is responsible.

The general principles here applied will be found very fully and clearly discussed in two recent opinions by this Court delivered by *Mr. Justice Walker: Daniel v. Railroad,* 136 N. C., 517, and *Jackson v. Tel. Co., supra.*  And our disposition of this case is sustained by well-considered decisions of the Federal Court in *Text-Book Co. v. Heartt,* 136 Fed. Rep., 129, and *Gas Light Co. v. Lansden,* 172 U. S., 534.

There is nothing in *Hussey v. Railroad, supra,* that in any way militates against our present decision.  That was a case in which the complaint charged that defendant company had maliciously slandered the plaintiff.  There was a demurrer,

which admitted that the defendant had uttered the words, and the decision simply held, as we have here, that a corporation could under given circumstances be held responsible for the malicious torts of its agents. The question of when or under what circumstances the acts of the agent will be imputed to the company was in no way involved.

There was no error in directing a nonsuit, and the judgment below is

Affirmed.