R. H. SEWARD v. RECEIVERS OF SEABOARD AIR LINE
RAILWAY AND SEABOARD AIR LINE RAILWAY.

(Filed 22 May, 1912.)

1. Master and Servant—Discharged Employee—Privileged Commu-
nications—Interpretation of Statutes.

Chapter 858, Laws 1909, making an employer liable in penal
damages to a discharged employee if the employer "shall pre-
vent or attempt to prevent, by word or writing of any kind,
'his' obtaining employment with any other person, company, or
corporation," should be read in the light of the common law as
it existed before its enactment, to discover the remedy intended
to be supplied by the statute.

2. Master and Servant—Discharged Employee—Privileged Commu-
nications—Common Law.

Under the common law an employer would not be liable· in
damages if in good faith he made a report of the character of
his discharged employee to another who was considering en-
gaging his services; but if the report was knowingly false, or
if it was maliciously made, it was actionable.

3. Same—Railroads—Express Malice—Interpretation of Statutes.

When a report is made by one railroad company to another
upon a discharged engineer, the report is regarded as privileged,
and in the absence of express malice no cause of action can be
based on its publication.    (Chapter 858, Laws 1909.)    The doc-
trine is especially applicable in instances of this kind where the
interest of the public and of the other employees make it nec-
essary that only competent and careful men fill such responsible
positions.

159—16

**4. Same—Remedial Statutes.**

Chapter 858. Laws 1909. was intended to correct the abuses under the common law of statements made concerning a discharged employee out of malice, where damages for the loss of employment were difficult of admeasurement; and under the provisions of the act a statement made as to the standing of the discharged employee is not privileged, if made maliciously, and the employer has thereby prevented or attempted to prevent the discharged employee from obtaining employment.

**5. Same—Principal and Agent—Evidence—Questions for Jury.**

A railroad company, upon the request of a discharged engineer. made reports to several railroad companies to whom the employee had applied for work, of such character as to prevent his being employed by them, with a statement that the employee was suing the railroad for damages for a personal injury. In his action against his former employer, under chapter 858, Laws 1909, the employee alleged and offered evidence tending to show that the report was untrue. It appearing that the one who made the report was duly authorized to make it by the defendant company, and that the suit referred to was thereafter settled upon a payment to the employee of substantial damages, and the employer knowingly continued to make the same statements: *Held*, the question should have been submitted to the jury upon the question of malice, and that the statement as to the suit was not a privileged communication as a matter of law.

BROWN, J., dissenting.

APPEAL from *Webb, J.,* at February Term, 1912, of WAKE.

This is an action to recover damages under chapter 858, Laws 1909, for preventing or attempting to prevent the plaintiff from obtaining employment with certain railroad companies as an engineer.

The plaintiff entered the employment of the defendant as engineer, on 31 January, 1907, and was discharged on 9 January, 1909. After his discharge he applied to the Florida East Coast Railroad Company for employment, and this company, with the consent of the plaintiff, requested the defendant to give it a report of the record of the plaintiff, to which request the defendant replied on 22 January, 1909, as follows:

"As per your request of the 18th instant, I beg to give below the record of Engineman R. H. Seward:

"Entered service 31 January, 1907.

"Charged with thirty days actual suspension for refusing to go out.

"Thirty days on account of accident.

"Thirty days actual suspension for damage on account of crown sheet to engine being damaged.

"Thirty days actual suspension for responsibility in connection with collision, and

"Forty-five days record suspension for minor offenses, and

"Dismissed 9 January, 1909, for leaving station on time of another train, resulting in head-on collision."

The plaintiff also applied to the Norfolk and Southern Railroad Company for employment, and upon request from said company for the record of the plaintiff, the defendant replied, on 9 July, 1909, as follows:

"As per your request of 7 July, beg to give below report of Engineman R. H. Seward while in our service, and will state further that this man is now suing the S. A. L. for personal injury.

"Entered service 31 January, 1907.

"Charged with thirty days actual suspension for refusing to go out.

"Thirty days on account of accident.

"Thirty days actual suspension for damages to crown sheet of engine.

"Thirty days actual suspension for responsibility in connection with collision, and

"Forty-five days record suspension for minor offenses, and

"Dismissed 9 January, 1909, for leaving station on time of another train, resulting in head-on collision."

The plaintiff also applied to the Durham and Charlotte Railroad Company for employment, and upon request of said company for the record of the plaintiff, the defendant replied, on 15 December, 1909, as follows:

"Yours of 11 December. Kindly find below record of R. H. Seward:

"Entered service 31 January, 1907.

"Charged with thirty days actual suspension for refusing to go out.

"Thirty days on account of accident.

"Thirty days actual suspension for damage to crown sheet of engine.

"Thirty days actual suspension for responsibility in connection with collision, and

"Forty-five days record suspension for minor offenses, and

"Dismissed 9 January, 1909, for leaving station on time of another train, resulting in head-on collision."

The action for personal injury referred to in the letter of defendant of 9 July, 1909, was commenced after the discharge of the plaintiff by the defendant, and was settled in October, 1909, by the payment of $1,350 to the plaintiff.

The plaintiff offered evidence tending to prove that he was refused employment by the several companies to which he had applied, by reason of the reports made by the defendant, and that the statements contained in the reports were false.

He admitted, however, on cross-examination, that he was notified of each charge contained in the report, and had a hearing thereon, and there was no evidence that the report did not contain a true statement of the action of the defendant upon the charge.

The part of chapter 858, Laws 1909, relevant to this case is as follows:

"If any person, agent, company, or corporation, after having discharged any employee from his or its service, shall prevent or attempt to prevent, by word or writing of any kind, such discharged employeee from obtaining employment with any other person, company, or corporation, such person, agent, or corporation shall be guilty of a misdemeanor, and shall be punished by a fine not exceeding $500, and such person, agent, company, or corporation shall be liable in penal damages to such discharged person, to be recovered by a civil action; but this section shall not be construed as prohibiting any person or agent of any company or corporation from informing, in writ-

ing, upon request, any other person, company, or corporation to whom such discharged person or employee has applied for employment, a truthful statement of the reason of such discharge."

The plaintiff contended:

(1) That the defendant had no right, under the statute, to give the record of the plaintiff, and could do no more than state the reasons for his discharge.

(2) That if the defendant could give the record of the plaintiff, it did not state it truthfully, and was actuated by malice.

The defendant contended:

(1) That it had the right, upon request, to give the entire record of the plaintiff, and that its communications were privileged and not actionable, in the absence of malice.

(2) That there was no evidence of malice.

At the conclusion of the evidence his Honor, upon motion of the defendant, entered judgment of nonsuit, and the plaintiff excepted and appealed.

*Douglass. Lyon & Douglass and R. N. Simms for plaintiff.*
*W. H. Pace and Armistead Jones & Son for defendant.*

ALLEN, J., after stating the case: The statute under which this action is brought, by its express terms embraces "any person, agent, company, or corporation," and is applicable alike to all who employ labor.

It must be read in the light of the common law as it existed prior to its enactment, for the purpose of seeing wherein it was deficient, and of discovering the remedy intended to be supplied by the statute. Black on Interpretation of Laws, p. 232, says: "When any question arises as to the meaning or the scope of a statutory enactment, it is a good rule to compare it with the common law on the same subject, and to construe the statute with reference to that law. . . . No statute enters a field which was before entirely unoccupied. It either affirms, modifies, or repeals some portion of the previously existing law. In order, therefore, to form a correct estimate of its scope and effect, it is necessary to have a thorough understanding of the laws, both common and statutory, which heretofore were appli-

cable to the same subject. Whether the statute affirms the rule of the common law on the same point, or whether it supplements it, supersedes it, or displaces it, the legislative enactment must be construed with reference to the common law, for in this way alone is it possible to reach a just appreciation of its purpose and effect. Again, the common law must be allowed to stand unaltered as far as is consistent with a reasonable interpretation of the new law"; and again on page 110: "The intention of the Legislature in enacting a particular statute is not to be ascertained by interpreting the statute by itself alone, and according to 'the mere literal meaning of its words. Every statute must be construed in connection with the whole system of which it forms a part, and in the light of the common law and of previous statutes upon the same subject. And the Legislature is not to be lightly presumed to have intended to reverse the policy of its predecessors or to introduce a fundamental change in long-established principles of law."

When we look to the common law, we find that the employer had the right to employ whom he pleased, and to discharge with or without reason, and that the employee could select the person whom he would serve, and had the right to quit the service at pleasure, the only limitation upon the exercise of the right by either being the terms of the contract of service.

"An employer has a right to select his employees according to what standard he may choose, though such standard be arbitrary or unreasonable. An employer certainly has a right to refuse to employ any one whom he knows to have left another employer in violation of a reasonable rule which both employers are seeking to enforce. . . . There are, however, limitations upon the rights of the employers in this matter. While the employee is bound by the reasonable rules of the employer, as a part of the contract of employment, and may be reported to other employers for a breach of those rules, there is a correlative duty upon the employer not to report an employee wrongfully. The rule which enters into the contract of employment is as much a part of the contract of the employer as of the employee, and both are bound by it. The employer is strictly within his rights as long as he reports no employee for

a violation of the rule except such as have actually violated it. When, however, he wrongfully makes such a report and an employee is thereby damaged, such employee has a right of action." *Willis v. Manufacturing Co.,* 120 Ga., 600.

"It is a part of every man's civil rights to enter into any lawful business, and to assume business relations with any person who is capable of making a contract. It is likewise a part of such rights to refuse to enter into business relations, whether such refusal be the result of reason, or of whim, caprice, prejudice, or malice. If he is wrongfully deprived of these rights, he is entitled to redress. Every person *sui juris* is entitled to pursue any lawful trade, occupation, or calling. It is part of his civil rights to do so. He is as much entitled to pursue his trade, occupation, or calling, and be protected in it, as is the citizen in his life, liberty, and property. Whoever wrongfully prevents him from doing so inflicts an actionable injury. For every injury suffered by reason of a violent or malicious act done to a man's occupation, profession, or way of getting a livelihood, an action lies. Such an act is an invasion of legal rights. A man's trade, occupation, or profession may be injured to such an extent, by reason of a violent or malicious act, as would prevent him from making a livelihood. . . . A railroad company has the right to engage in its service whomsoever it pleases, and as part of its rights to conduct its business is the right to discharge any one from its service, unless to do so would be in violation of contractual relations with the employee. It is the duty of a railroad company to keep in its service persons who are capable of discharging their important duties in a careful and skillful manner. The public interest, as well as the vast property interests of the company, require that none other should be employed by it. Its duty in this regard and its right to discharge an employee does not imply the right to be guilty of a violent or malicious act which results in the injury of the discharged employee's calling. The company has the right to keep a record of the causes for which it discharges an employee, but in the exercise of this right the duty is imposed to make a truthful statement of the cause of the discharge." *Hundley v. R. R.,* 105 Ky., 164.

The intelligence and skill of the employee were regarded as his capital, which he had the right to sell, and which the employer had the right to buy, and an unlawful interference with the right of either was actionable.

As was said in *Willner v. Silverman,* 109 Md., 356: "In furtherance of their common welfare and in settlement of their ofttimes conflicting interests, both employers and employees stand upon a plane of perfect equality before the law, enjoying the same freedom and amenable to the same restrictions."

When the employee was discharged, he could not require a statement of the reasons for the discharge, and the employer was under no legal obligation to give to any one, with whom he sought employment, his record or character, while in his service, although he could do so upon request, and according to some of the authorities, voluntarily, and there would be no liability in damages if the report was made in good faith, and in the belief that it was true, although in fact false; but if made maliciously, it was actionable.

"An ex-employer may, without rendering himself liable in an action for slander or libel, in *good faith,* state orally or in writing, and as well without as with a previous request, all that he may *believe* to be true concerning his ex-employee. It appearing that the publication was made in what is termed 'giving a character,' the presumption is that it is made *bona fide,* and the burden is on the plaintiff to show *malice* in the publisher, *i. e.,* either that he had an intent to injure the person spoken of or that he did not believe in the truth of the statement published. Where no intent to injure exists, a belief in the truth of the language published is a legal excuse for making the publication; but where an intent to injure exists, a belief in the truth of the language published is not a legal excuse for making the publication. *Malice,* or want of *good faith,* is established when it is shown that the matter published was false within the knowledge of the publisher; or malice may be established by showing a bad motive in making the publication, as that it was made more publicly than was necessary to protect the interests of the parties concerned, or that it contained matter not relevant to the occasion, or that the publisher entertained ill-will

toward the person whom the publication concerned." Townshed on Slander and Libel, sec. 245, p. 420.

"The instance that occurs most frequently in ordinary life of this first class of privileged communications is where the defendant is asked as to the character of his former servant, by one to whom he or she has applied for a situation. A duty is thereby cast upon the former master to state fully and honestly all that he knows either for or against the servant; and any communication made in the performance of this duty is clearly privileged for the sake of the common convenience of society, even though it should turn out that the former master was mistaken in some of his statements. But if the master, knowing that the servant deserves a good character, yet, having some grudge against him, or from some other malicious motive, deliberately states what he knows to be false, and gives his late servant a bad character, then such a communication is not a performance of the duty, and therefore is not privileged. There is, in fact, in such a case, evidence of express malice, which 'takes the case out of the privilege.'" Odgers on Libel and Slander, p. 199.

"One of the most ordinary occasions of everyday life which brings into existence the question of privilege in regard to communications is when one person, either voluntarily or in answer to an inquiry, states his own views to another concerning the character of some individual who has left his service and seeks to obtain employment elsewhere. A duty is thereby cast upon the former master to state fully and honestly all that he knows either for or against the servant; and any communication made in the performance of this duty is clearly privileged for the sake of the common convenience of society, even though it should turn out that the former master was mistaken in some of his statements. But if the master, knowing that the servant deserves a good character, yet, having some grudge against him, or from some other malicious motive, deliberately states what he knows to be false, and gives his late servant a bad character, then such a communication is not a performance of the duty, and therefore is not privileged. There is in fact, in such a case, evidence of malice, which 'takes the case out of the privilege.'" Newell on Defamation, Libel, and Slander, p. 490.

"It seems to us that any person who upon reasonable grounds believes himself to be possessed of knowledge which, if true, does or may affect the rights and interests of another, has the right in good faith to communicate such belief to that other, and he may make the communication with or without request, and whether he has or has not personally any interest in the subject-matter of the communication." *R. R. v. Richmond,* 73 Texas, 575.

The report was regarded as privileged, and in the absence of express malice no cause of action could be based on its publication, this doctrine resting on the moral obligation of the employer.

The life and limb of the employee were largely dependent on the intelligence, skill, and prudence of his coemployees, and it was the duty of the employer to exercise care to see that no one was admitted to the common employment who was careless or incompetent. The employer owed the same duty to the public, whose lives and property were committed to his care, and this duty could not be performed unless one employer could, without fear of liability, communicate freely his honest belief as to the standing of a discharged employee, and the law, therefore, said that such communications were presumed to be made in the performance of a duty, and in the absence of express malice they could not be made the basis of an action.

"The general doctrine of privilege, as applied to actions for libel and slander, is founded upon the reasonable view that in the intercourse between members of society, and in proceedings in legislative bodies and in courts of justice, occasions arise when it becomes necessary or proper that the character and acts of individuals should be considered and made the subject of statement or comment, and that, in the interests of society, a party making disparaging statements in respect to another on such a lawful occasion should not be subjected to civil responsibility in an action of this character, although such statements are untrue. The law of privilege has been stated by judges in different forms of words, but the comprehensive definition of *Blackburn, J.,* in *Davie v. Sneed* (L. R. (5 Q. B.), 611), as applied to communications between individuals, is especially

worthy of notice: 'Where,' says that learned judge, 'a person is so situated that it becomes right in the interests of society that he should tell a third person certain facts, then if he, *bona fide* and without malice, does tell them, it is a privileged communication.' There are many examples in the books of communications held to be privileged, where the same words, if used other than on a lawful occasion, would be libelous, but which, by reason of the occasion when they were published, or spoken, will not sustain an action, although proved to be untrue, unless proved to have been spoken maliciously. The cases of charges made in giving the character of a servant, or in answering an authorized inquiry concerning the solvency of a tradesman, or where the communication was confidential between parties having a common interest in the subject to which it relates, are illustrations." *Moore v. Bank,* 123 N. Y., 424.

"It (a report by an employer) was made upon a subject-matter in which the person communicating it had a deep interest, as well as a duty to perform, and was made to a person having a corresponding interest and duty. If one of defendant's servants had demonstrated his unfitness for a position held by him, it was for its interest, as well as for the interest of the public, that steps should be taken which would render the servant qualified and capable, or that he be dismissed. It would not only be for the interest of the company to remedy the evil, and to act so as to stop all future complaints, but it would be a matter of duty to the public. . . . The communication being of a privileged character, and having been made on a privileged occasion only, the *prima facie* effect was to overcome and rebut the quality or element of malice, and to cast upon the plaintiff the necessity of showing malice in fact; that is, that the defendant was actuated by ill-will in what it caused to be done and said, with a design causelessly and wantonly to injure the plaintiff. The law is that a communication, to be privileged, must be made upon a proper occasion, from a proper motive, and must be based upon reasonable or probable cause. When not made in good faith, the law does not imply malice from the communication itself, as in the ordinary case of libel.

Actual malice must be proved before there can be a recovery, and in the absence of such proof the plaintiff cannot recover." *Herner v. R. R.,* 78 Minn., 291.

We cannot think it was the intention of the General Assembly to withdraw these wholesome safeguards from employees and the public, and that the statute may be effective, and will serve a useful purpose, without abrogating the principles of the common law. In speaking of a statute having the same objects in view as the one under consideration, the Supreme Court of Minnesota says: "The act does not attempt to interfere with the right of an employer to discharge an employee for cause or without cause. It does not seek to prohibit an employer from communicating to other employers the nature and character of his employees, when the facts would be for their interest. . . . It is the purpose of this law to protect employees in the enjoyment of those natural rights and privileges guaranteed them by the Constitution, viz., the right to sell their labor and acquire property thereby." *S. v. Justus,* 85 Minn., 282.

Prior to the ratification of the act of 1909, statements as to the character and competency of discharged employees were frequently made voluntarily, and not upon request, and were sometimes prompted by malicious motives, when the motive was difficult of proof; when malice and the loss of service, as the result of the statement, were proven, the damages were difficult of admeasurement; and when there was no loss of employment, but a mere attempt to prevent the employee from obtaining it, no compensatory damages could be awarded.

The act remedies these defects, and under its provisions a statement as to the standing of a discharged employee is not privileged, unless made upon request; and whether privileged or not, if made maliciously, and the employer has thereby prevented or attempted to prevent the discharged employee from obtaining employment, the jury may award penal damages.

"Malice or want of good faith is established when it is shown that the matter published was false within the knowledge of the publisher; or malice may be established by showing a bad motive in making the publication, as that it was made more publicly than was necessary to protect the interest of the par-

ties concerned, or that it contained matter not relevant to the occasion, or that the publisher entertained ill-will toward the person whom the publication concerned." Town S. and L., sec. 245.

The employer has the right, under the statute, upon request, to give "a truthful statement of the reason for such discharge," and we do not give to these words the restricted meaning contended for by the plaintiff, as in our opinion they include the record of the employee, and if the statement is so made, in the honest belief that it is true, and not maliciously, the employer is protected.

The Supreme Court of Texas, in discussing a similar statute, says in R. R. v. Hixon, 137 S. W. R., 345: "By the term, 'a true statement' of the cause of his discharge, is meant the employer shall give fairly, honestly, and in good faith the ground or cause upon which the master acted. It was meant that he should not be permitted to discharge for one reason and, when called on to give a statement thereof, assign a different reason."

Applying these principles to the evidence, and it appearing that the plaintiff admits that he was suspended, for alleged misconduct, one hundred and sixty-five days during a service of a little less than two years with the defendant; that he was given a hearing as to each charge, and knew of the record that was made against him, and that the Brotherhood of Locomotive Engineers, of which he was a member, refused to prosecute his appeal when he was finally discharged, we would not hesitate to affirm the judgment of nonsuit, but for the fact that the plaintiff says that the charges contained in the report made by the defendant are not true, and the further fact that the defendant incorporated in its letter of 9 July, 1909, written by its superintendent, Poole, the statement, "and will state further that this man is now suing the S. A. L. for personal injury," which could not be a part of the record of the plaintiff while in the employment of the defendant, nor a reason for his discharge, as the suit was instituted after he left the service of the defendant.

This statement is competent evidence against the defendant because it was within the scope of Poole's employment to fur-

nish a copy of the plaintiff's record, and it was made while performing this duty; and as said by *Justice Brown* in *Younce v. Lumber Co.,* 155 N. C., 241: "It is well settled that the declarations of officers of a corporation are competent only when made in line of declarant's official duty, and while discharging it in reference to a transaction for the company."

It is not a sufficient answer as to the effect of this evidence to say that the statement is true, as it was not information the defendant was requested to give, and did not bear on the character or competency of the plaintiff, and was calculated to prejudice him.

There is also evidence that the action instituted by the plaintiff against the defendant, referred to in the letter of 9 July, 1909, was to recover damages for personal injuries sustained in a collision, which was one of the most serious charges against the plaintiff; that this action was settled in October, 1909, by the payment of $1,350 to the plaintiff, and that thereafter the defendant, in his letter of 15 December, 1909, retained this same charge against the plaintiff.

These facts at least permit the inference, which the jury are not compelled to adopt, that the defendant would not have paid the sum of $1,350 to the plaintiff voluntarily, on account of injuries sustained in a collision, if he had been guilty of wrongdoing, and that the retention and publication of the charge after the settlement was with knowledge that it was not true.

The statute is a wise one, and will serve a useful purpose, if judiciously administered; but juries, in the assessment of damages, when they can be recovered, should mark the line and discriminate clearly between the employee, who has honestly endeavored to perform his duty, who is entitled to the highest consideration, and the negligent and reckless employee, who is a menace to his coemployees and the public.

Upon a review of the whole record, we are of opinion that there was some evidence for the consideration of the jury, and a new trial is therefore ordered.

New trial.

BROWN, J., dissenting: The statute under which this action is brought, which is correctly copied in the opinion of the Court, is a very useful piece of legislation, and is intended as well for the protection of the traveling public as for the benefit of all employees who discharge their duty in a faithful manner.

Taking the statute as a whole, it seems to be very plain in its meaning. The gravamen of the cause of action is an attempt to prevent by word or writing of any kind which is false a discharged employee from obtaining employment. The statute expressly excepts from its operation any cause of action when the statement made by the employer *contains a truthful statement of such discharge.*

In this case the plaintiff is an engineer. He belonged to a class of men who daily take their lives in their hand for our benefit, and to a profession whose unpretending, self-sacrificing heroism has been immortalized in song and story.

Of all professions which are interested in having the records of their members made known for the benefit of the efficient and faithful, the profession of a locomotive engineer stands first. In order that publicity may be given to such records, the statute expressly authorizes the giving of a truthful statement as to why an employee has been discharged. If the statement is truthful, it is immaterial what the motive of the master may be in furnishing. If his motive is to prevent the employment in a position of immense responsibility of an incompetent or unfaithful person, then the motive is a laudable one.

The charge which the plaintiff makes in his complaint is that the defendant company, through its superintendent of motive power, Poole, attempted to prevent his getting employment with certain railroad companies by means of furnishing them with an untruthful statement of his service and record with the defendant company. These letters are published in the opinion of the Court.

I am constrained to hold that the testimony of the plaintiff, himself, shows that every material statement set out in these letters has been substantiated by his own evidence, and that upon such testimony the learned judge of the Superior Court was justified in sustaining the motion to nonsuit.

The plaintiff's evidence tends to prove that he entered the employment of the defendant 31 January, 1907, and was dismissed 9 January, 1909. During his employment there was in force on the defendant railway the "merit system," whereby an engineer received demerits for bad conduct, and upon receiving a given number within twelve months, he was discharged. If he did not receive any demerits, then he was given a good mark. During the time of the employment of the plaintiff, a period less than two years, he was actually suspended for 120 days on account of accidents and other charges, and also received 45 days record suspension.

The plaintiff admitted upon cross-examination that he was present and his examination taken each time he was suspended, and that he was notified of his suspension. He admits that under the rules of the company he had a right to appeal in each instance in which he was not satisfied with the action of the company in suspending him, and that such appeal could be prosecuted personally by him, or by a committee composed of members of the Brotherhood of Locomotive Engineers.

The plaintiff further admits, although he was suspended on so many occasions, he appealed only on one occasion when he was discharged, and that the Brotherhood of Locomotive Engineers refused to take up the appeal for him, even after he had asked them to do so.

The plaintiff testified also, in respect to the trials by the officers of the defendant in regard to each of the items set forth in the three letters, as follows:

"These were all investigated. Was notified; was present at each investigation, but did not appeal except in the last case."

It is further admitted by the plaintiff upon his examination that when he applied to the Florida East Coast Railroad, and the Norfolk Southern, and the Durham and Charlotte, the three railroads to whom these letters were addressed, he authorized the officers of these railroads to apply to the defendant company for his record, and that this record furnished by the superintendent of motive power, Poole, was sent to the said railroad companies at their request, and by the permission of the plaintiff, himself.

It appears to me to be almost incontrovertible that upon a comparison of the plaintiff's own evidence with the record furnished to the said companies, every fact set out in the record is established by the plaintiff, himself.

It is admitted in the opinion of the Court that the judgment of nonsuit would be sustained by the majority of my brethren upon the plaintiff's own evidence, except for the fact that in his letter of 9 July, 1909, Poole made this statement, "and will state further that this man is now suing the Seaboard Air Line for personal injury."

The majority seem to be of opinion that this statement affords some slight foundation for this action, because the suit was instituted after the plaintiff left the service of the defendant. But the record shows that this suit was pending at the time the request was made for the plaintiff's record, and that the statement was a truthful statement. It is not pretended in the letter that it was a part of his record. On the contrary, the language shows that it refers to a period after his discharge, for the writer says "that this man is now suing the Seaboard Air Line for personal injury."

It was a statement of a fact admitted to be true, and which could be easily discovered while examining the records of the court. Surely, it cannot be held to be an evidence of malice because the writer of the letter stated a fact which was manifest to all who chose to examine the public records of the courts of the State. If this is the only ground upon which this action can possibly be maintained, then, with all deference to my brethren, it appears to me too trivial to receive a moment's consideration.

There is another reason which impels me to the conclusion that the plaintiff cannot recover because of such statement inserted in the letter of 9 July, and that is because it was an unauthorized act of Poole, outside of and beyond his duty, and in no sense ratified by the defendant.

While Poole in his capacity as superintendent of motive power was authorized to communicate a truthful statement as to why the plaintiff was discharged, it appears upon the face of the letter itself that the statement in regard to the suit was

159—17

not a reason for the discharge of the plaintiff, because the suit was brought long after his discharge, and it was, therefore, the unauthorized act of Poole, and in no way connected with his duty as a servant or officer of the defendant company.

In Wood on Master and Servant, sec. 279, p. 535, it is said: "The question usually presented is whether, as a matter of fact or of law, the injury was received under such circumstances that, under the employment, the master can be said to have authorized the act; for if he did not, he cannot be made chargeable for its consequences, because, not having been done under authority from him, express or implied, it can in no sense be said to be his act."

It is admitted that it was within the scope of Poole's employment to furnish a copy of the plaintiff's record, and to give a truthful statement of the reason for his discharge, but it was not within the scope of his employment to inject into that statement matters entirely foreign to it and entirely disconnected with it, and which appear upon the face of the statement to have transpired long after the discharge. It seems to me that the act of inserting such foreign matter was not at all incident to the performance of the duties entrusted to Pool by the defendant company, any more than an amanuensis would be authorized to inject the emanations of his own brain into a composition dictated by his master.

I think this position is fully supported by the decisions of this Court in *Daniel v. R. R.,* 136 N. C., 517; *Jackson v. Telegraph Co.,* 139 N. C., 347; and *Sawyer v. R. R.,* 142 N. C., 1.

It is not pretended in this case that there was any express authority given to Poole to make any statement concerning the plaintiff on behalf of the defendant company, which had taken place after the plaintiff had ceased to be in its employment. The relation of master and servant had then terminated, and this extraneous matter was inserted by Poole, as appears upon the face of the letter, upon his own authority, and there is no pretense that it was ever ratified by the defendant. On the contrary, it appears upon the face of the communication to be Poole's act and not that of the company.

The principal is not liable, as stated by *Mr. Justice Walker* in *Daniel v. R. R.*, "when the agent steps aside from the duties assigned to him by the principal to gratify some personal animosity, or to give vent to some private feeling of his own."