MAGNOLIA RIDDLE, by Her Next Friend, E. C. RIDDLE, v. WILBURN WHISNANT and J. E. GUY.

(Filed 8 October, 1941.)

**1. Trial § 22b—**

Upon motion to nonsuit, the evidence tending to support plaintiff's cause of action is to be considered in the light most favorable to him, and he is entitled to every reasonable intendment thereon and every reasonable inference therefrom. C. S., 567.

**2. Automobiles § 24b—Evidence held insufficient for jury upon issue of respondeat superior.**

Evidence tending to show that the driver of the car was employed in a garage, that the employer permitted the employee to take his car for use of the employee in driving to his home Saturday night and in returning to work Monday morning, that the employee, in response to questioning by the employer, stated that he would get another car if he had to make a trip on Sunday, and that the accident in suit occurred while the employee was driving the car on Sunday on a personal errand, *is held* insufficient to be submitted to the jury upon the doctrine of *respondeat superior.*

APPEAL by plaintiff from *Olive, Special Judge,* at April-May, 1941, Special Term, of YANCEY. Affirmed.

This is an action brought by plaintiff against the defendants for damages for injuries sustained by the plaintiff while riding as a passenger in an automobile, operated by one E. C. Riddle, which collided with a 1936 Plymouth Tudor Sedan, on 15 December, 1940, while being operated by the defendant Wilburn Whisnant, whom the plaintiff alleges was acting as agent and servant of his codefendant, J. E. Guy.

The defendant Wilburn Whisnant filed no answer in the action. The defendant J. E. Guy filed an answer and denied the allegations of the complaint. "That at said time and place the defendant Wilburn Whisnant was operating the said Plymouth automobile as agent and servant of his codefendant, J. E. Guy."

Wilburn Whisnant, a defendant in this action and a witness for plaintiff, testified, in part: "I began working for Mr. Guy on December 5th, 1940, as a mechanic and to help sell anything there was to sell. I was paid a straight salary of $10.00 per week. I worked there in the shop part of the time. There was no agreement what I was to do, whether I was to sell cars, or mechanic or what, I never sold a car. I would work around there from eight o'clock in the morning to five in the afternoon, I would say, something like that. I live about four miles from Spruce Pine, at Estatoe. Up until Friday, December 13th, I would go back and forward to work with John Miller. Then John Miller quit working there on Friday, the 13th, and I asked Mr. Pierce if I could have a car to go to my home and back the next morning. I had a conversation with Mr. Guy, when I started home Saturday. He asked me which car I was going to drive, he asked me if I was going to use that car on Sunday and I told him if I was going on any particular business of my own I could get another car. He did not tell me he didn't want me to drive that car. He did not ask me if I was going to drive it anywhere on Sunday. He asked me if I was going anywhere on Sunday. I told him not that I knew of, and if I was going anywhere on any other business, I could get another man's car. I told him if I was going anywhere on particular business, I could get another car. I told him I wasn't going to use the car and if I went anywhere on particular business I could get another car. I did not tell him anything about going to Micaville, and I didn't tell him anything about going anywhere with the car on Sunday. At that time, Miss Pearl Wilson was staying with us and she lived with Mr. Zeb Thomas at Micaville. My wife and I did not take Pearl Wilson to Zeb Thomas' house at Micaville on Saturday night. She had gone on Friday on the bus. Mrs. Zeb Thomas is my wife's aunt, I think. I and my wife went to her aunt's house, Zeb Thomas', Saturday night. Miss Faye Wilson was there at that time. She volunteered to come home with us, and came home with us Saturday night. She is no kin to my wife. I did not see Fred Thomas at all that night. I spent the evening at Zeb Thomas' house from around 7:30 to around 9:00 o'clock. On Sunday, I and my wife and family went back to Zeb Thomas' at Micaville, and we took Faye Wilson back with us. . . . On Sunday afternoon, I went to see Fred Thomas and my wife and two children went along with me. Like I told you a while ago, there was no parking place, and I went up to Zeb Thomas' house. It was where I always parked when I used to live there. Faye Wilson was living with her mother upstairs in the same house with Zeb Thomas. I took my wife and two children to Zeb Thomas' house, they went along with me. We got there around two to two-thirty o'clock. . . . Fred Thomas came up to Zeb Thomas' house while my family

and I were there, and he and I got in this car and went from Micaville up to the Jig Mine, which was a little better than five miles from Micaville. That Jig Mine was between Micaville and Estatoe, my home. Fred Thomas and I went to the Jig Mine and I left Fred Thomas at the Jig Mine. That was about five miles East of Micaville. I then went back to Micaville to get my family. Fred Thomas was not with me when I went back to Micaville. I got my wife and children and Pearl Wilson and it was about dusk then. I was going back to see Fred Thomas. I wanted to see him before I went home. . . . I went back and got my family in Micaville and then was going East when this accident happened. This accident happened before I got back to the point where I had left Fred Thomas. I had left Fred Thomas on this main highway from Micaville to Spruce Pine and the accident happened about a mile and a half from Micaville. I had gone back five miles to get my family and was about a mile and a half back on the road when the accident happened East of Micaville. In going from Micaville to Estatoe to my home, I go right by the place I had left Fred Thomas. I did not see Fred Thomas any more that day."

At the close of plaintiff's evidence, the defendant, J. E. Guy, moved for judgment as in case of nonsuit, which motion was allowed, and judgment was thereupon rendered by the court dismissing the action as of nonsuit. Upon the dismissal of the action, as to the defendant, J. E. Guy, the plaintiff took a voluntary nonsuit as to the defendant, Wilburn Whisnant, excepted to the ruling of the court in granting the motion of nonsuit as to the defendant J. E. Guy, excepted, assigned error, and appealed to the Supreme Court.

*Briggs & Atkins* for plaintiff.
*Williams & Cocke* for defendant.

CLARKSON, J. At the close of the plaintiff's evidence, on motion of defendant J. E. Guy, the court below granted judgment as in case of nonsuit as to him. C. S., 567. In this we can see no error.

On a motion to nonsuit, the evidence is to be taken in the light most favorable to the plaintiff, and he is entitled to the benefit of every reasonable intendment upon the evidence and every reasonable inference drawn therefrom.

There seems to be no controversy that the plaintiff was seriously injured by the negligence of Wilburn Whisnant. He filed no answer to the charge of negligence made by plaintiff against him.

The questions involved: At the time of the injury to plaintiff, was Wilburn Whisnant acting as agent and servant of J. E. Guy; if so, was he acting in the scope of his employment at the time of the accident? We think the answers must be No.

The strongest evidence for plaintiff was that of Wilburn Whisnant, a defendant and driver of the car. He testified, in part: "I was paid a straight salary of $10 per week. I worked there in the shop part of the time. There was no agreement what I was to do, whether I was to sell' cars, or mechanic, or what. I never sold a car. I would work around there from around eight o'clock in the morning to five in the afternoon, I would say, something like that. . . . I did not tell him (J. E. Guy) anything about going to Micaville and I didn't tell him anything about going anywhere with the car on Sunday."

In *Grier v. Grier,* 192 N. C., 760 (763), is the following: "The answer to this question depends upon whether or not the salesman, at the time of committing the negligent act, was acting within the 'scope of his employment.' One of the leading cases in this State on the question of 'scope of employment' is *Sawyer v. R. R.,* 142 N. C., 1. *Justice Hoke,* quoting from Wood on Master and Servant, says: 'The test of liability in all cases depends upon the question whether the injury was committed by the authority of the master, expressly conferred or fairly implied from the nature of the employment and the duties incident to it. The simple test is whether they were acts within the scope of his employment; not whether they were done while prosecuting the master's business, but whether they were done by the servant in furtherance thereof and were such as may fairly be said to have been authorized by him. By "authorized" is not meant authority expressly conferred, but whether the act was such as was incident to the performance of the duties entrusted to him by the master, even though in opposition to his express and positive orders.' "

In *Covington v. Threadgill,* 88 N. C., 186 (189), we find: "In *Melvin v. Easley,* 7 Jones, 356, it was conceded by the whole Court, though they differed as to other points, that a contract made on Sunday was *illegal,* and could not support an action, upon the ground that the Act of 1741 (Bat. Rev., ch. 115, sec. 1) declared that 'no person shall on Sunday exercise the work of his ordinary calling, upon pain that he should forfeit and pay one dollar, and it was expressly said that no distinction could be admitted between contracts made in contravention of the policy of the law, whether *malum in se* or *malum prohibitum.*"

The trip made in defendant's automobile was on Sunday, not in the scope of Whisnant's employment, and was without Guy's permission. The purpose was personal—an outing and visit by Whisnant, taking his wife and two children with him. Whisnant went on an errand of his own (to get his wife and children) when the accident occurred. He testified: "Fred Thomas and I went to the Jig Mine and I left Fred Thomas at the Jig Mine. That was about five miles East of Micaville.

I then went back to Micaville to get my family. Fred Thomas was not with me when I went back to Micaville. I got my wife and children and Pearl Wilson and it was about dusk then. I was going back to see Fred Thomas. I wanted to see him before I went home. . . . I went back and got my family in Micaville and then was going East when this accident happened. This accident happened before I got back to the point where I had left Fred Thomas."

In Blashfield Cyc., Vol. 5, pages 175-6, sec. 3029, the following rule is laid down: "The general rule is that a servant in charge of his master's automobile, who, though originally bound upon a mission for his master, completely forsakes his employment and goes upon an errand exclusively his own, and while so engaged commits a tort, does not thereby render the master answerable for such tort under the rule of *respondeat superior*," citing a wealth of authorities. *Parrott v. Kantor,* 216 N. C., 584.

We think the cases cited by plaintiff distinguishable from the present one. We see no error in the exclusion of the evidence in regard to an agreement as to inspecting the automobile of Fred Thomas. It was immaterial and irrelevant.

For the reasons given, the judgment of the court below is

Affirmed.